IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Deandre Minkens, (Y15896), | ) |
|            Petitioner, | ) ) ) Case No. 21 C 4125 |
| v. | ) ) Hon. Robert W. Gettleman |
| Jackson, Warden, | ) ) ) |
|            Respondent. | ) |

**MEMORANDUM OPINION AND ORDER**

Petitioner Deandre Minkens, an inmate at the Pontiac Correctional Center, brings this *pro se* habeas corpus action pursuant to 28 U.S.C. § 2254 challenging his murder and intentional homicide of an unborn child convictions from the Circuit Court of Cook County. The Court denies the petition and declines to issue a certificate of appealability.

**I.**     **Background**

The Court draws the following factual history from the state court record (Dkt. 13.) and state appellate court opinion. State court factual findings, including facts set forth in the state court appellate opinion, have a presumption of correctness, and Petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C § 2254(e)(1); *Tharpe v. Sellers*, 138 S. Ct. 545, 546 (2018); *Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020) (citations omitted). Petitioner has not made such as showing.

Rosemary Newman's body was discovered in the Calumet City Forest Preserve on Easter Sunday, April 24, 2011. *Illinois v. Minkens*, 2020 IL App (1st) 172808, at ¶¶ 7, 10-11. She was found less than three blocks from Petitioner's home. *Id*. at ¶ 9. The victim was face down wearing only a green T-shirt, underwear, and ankle socks. *Id*. at ¶ 10. A subsequent autopsy

showed the victim died from strangulation. *Id*. She suffered blunt force trauma to the head and injuries to her mouth, nose, neck and back. *Id*. Rosemary was nine months pregnant at the time of her murder. *Id*.

The victim and Petitioner started a romantic relationship several months earlier in the summer of 2010. *Id*. at ¶ 6. She became pregnant, presumably with Petitioner's child. *Id*. The victim's mother testified that she believed Petitioner to be the child's father as he attended one of her daughter's ultrasound appointments. *Id*.

Petitioner was in a separate relationship with a second woman, Shante Thomas, who was angered by Petitioner's relationship with the victim. *Id*. Thomas began threatening the victim resulting in the victim filing a police report in 2011. *Id*. She was charged as a codefendant and convicted at a severed trial, conducted simultaneously with Petitioner's, of murder and intentional homicide of an unborn child and sentenced to a term of natural life in prison without the possibility of release. *Id*.; *see also Illinois v. Thomas*, 2020 IL App (1st) 170310, at ¶ 1.

The victim was living at her mother's apartment prior to her murder. *Minkens*, 2020 IL App (1st) 172808, ¶ 7. Per the mother, her daughter met Petitioner outside of her apartment at approximately 10:30 p.m. the prior evening and went to an Applebee's Restaurant less than two miles away. *Id*. The victim called her mother to let her know she made it safely to the restaurant and would be home soon. *Id*. Her daughter never returned home. *Id*.

The next morning, Petitioner called the victim's mother asking to speak to the victim. *Id*. at ¶ 8. According to the mother, Petitioner claimed on the call that he was out with Thomas the prior night, not the victim. The mother hung up immediately and called the police to file a missing person's report. *Id*.

Two police officers responded to the mother's call and interviewed her at her apartment. *Id*. at ¶ 9. The officers testified that the mother described the clothes her daughter was wearing the night before including a green T-shirt. *Id*. They also located the victim's prior police report involving Thomas threatening her as part of their investigation. *Id*.

The officers obtained Petitioner's phone number from the victim's mother. *Id*. Their calls were initially unanswered by Petitioner, but he returned the officers' calls later that afternoon. *Id*. at ¶¶ 9, 11. Petitioner told the officer that he had not seen the victim for several days explaining that he had been at a nightclub the prior evening. *Id*. at ¶ 11. The police investigation later discredited Petitioner as two Applebee's employees confirmed Petitioner and the victim were together in the restaurant the prior evening. *Id*. A surveillance video showed Petitioner at a gas station located close to the codefendant's residence more than 30 miles from the nightclub at the time he claimed to be at the club. *Id*.

The police arrested Petitioner and during questioning he admitted going to the Applebee's with the victim but claimed his friend, Josh Miller, also joined them at the restaurant. *Id*. at ¶ 12. Miller later testified that he was not with Petitioner that evening and that Petitioner had asked him to lie about his whereabouts. *Id*.

A jailhouse informant testified that Petitioner confessed to him when they were cellmates at the Cook County Jail. *Id*. at ¶ 13. Per the informant, Petitioner confessed the following. Petitioner and his codefendant were upset that the victim was pregnant with Petitioner's child, and the victim was unwilling to terminate the pregnancy. (Dkt. 13-10, pgs. 1337-38.) As a result, Petitioner and the codefendant planned to attack the victim to cause a miscarriage. *Id*. at 1344. Petitioner lured the victim to the Applebee's to have dinner under the false pretense that he was

3

ready to step up and be a father to the child. *Id*. at 1345. However, the true motive was to get the victim into the car and drive her to the forest preserves where they could attack her. *Id*. at 1347.

According to the informant, Petitioner explained that the codefendant hid in Petitioner's trunk as Petitioner and the victim drove from the Applebee's to the forest preserve where they parked. *Id*. The car's backseat had a panel allowing access from the trunk into the passenger cabin. *Id*. Petitioner turned up the music to alert the codefendant to come into the car and attack the victim. *Id*. at 1347, 1349. The codefendant came from the trunk and choked the victim with a phone cord from behind while she was sitting in the car's front passenger seat. *Id*. at 1349. Petitioner, who was sitting in the car's driver seat, began punching the victim in her stomach while the codefendant choked her. *Id*. at 1350. The victim struggled during the attack but eventually lost consciousness. *Id*. at 1351. Petitioner and the codefendant dumped the victim's body in a wooded area of the forest preserve. *Id*.

A video surveillance camera recorded Petitioner and the codefendant arrive at her apartment building at approximately 1:30 a.m., three hours after Petitioner and the victim had been together at the Applebee's. (Dkt. 13-10, pg. 1465-69.) Fifteen minutes later, Petitioner and the codefendant drove to a gas station located a few hundred feet from the apartment. *Id*. at 1471. The gas station video showed that Petitioner parked his car by the station's vacuum machine and the machine's light was blinking indicating it was in use. *Id*. at 1488. Another video showed Petitioner entered the gas station, and the worker exchanged a twenty dollar bill into a ten, five, and five singles for Petitioner. *Id*. at 1489. The worker explained at trial that the gas station's vacuum machine only took singles or coins. *Id*. at 1482.

The police later seized Petitioner's vehicle and conducted a forensic investigation. (Dkt. 13-10, pg. 1501.) The investigator found "a very large stain on the passenger side seat that --- it stood out to us . . ." *Id*. at 1509. The entire car was sprayed with a compound containing Luminol. *Id*. at 1512. The Luminol reacts with iron in blood causing a florescent glow. *Id*. There was a florescent glow noting the presence of blood on the front passenger seat and along the rocker panel by that seat. *Id*. at 1513. Subsequent DNA testing could not conclusively match Petitioner, the codefendant or the victim to the blood stain found on the passenger seat because the examiner could not separate out individual contributor DNA in the sample. *Id*. at 1555. However, Petitioner and the victim's DNA were found in the blood sample recovered from the rocker panel. *Id*. at 1558-59.

The prosecution also obtained the victim, Petitioner, and the codefendant's historical cell site location information from their cell phone providers to determine their movement on the evening of the murder. *Minkens*, 2020 IL App (1st) 172808, at ¶ 14. Cell phones continually scan for the best service signals which generally come from the closest cell tower sites. *Carpenter v. United States*, 138 S. Ct. 2206, 2211 (2018). Phones often connect to the cell site several times every minute and the contact generates a time-stamped record with the telephone provider. *Id*. The cell site data can be used to approximate a cell phone's location at the time it contacted the cell tower. *Id*.

In the instant case, an FBI expert used the historical cell site location information to approximate the victim's, Petitioner's, and codefendants' respective locations during the crime based on their proximity to cell towers. *Minkens*, 2020 IL App (1st) 172808, at ¶ 14. The

historical cell site location information was consistent with the course of events on the evening of the murder as presented by the prosecution at trial. *Id*.

Following the completion of trial, the jury found Petitioner guilty of all charges. *Minkens*, 2020 IL App (1st) 172808, at ¶ 15. The presentence investigation report showed that Petitioner had a lengthy criminal history including convictions for domestic battery, attempted burglary, and cruelty to children. *Id*. The trial court sentenced Petitioner to natural life in prison without the possibility of release. *Id*.

The Supreme Court decided *Carpenter v. United States*, 138 S. Ct. 2206 (2018), while Petitioner's direct appeal before the Appellate Court of Illinois was in briefing. *Carpenter* holds that a person's historic cell phone location information is protected by the Fourth Amendment, and consequently, the government must obtain a warrant supported by probable cause to obtain this information. 138 S. Ct. at 2220-21; *United States v. Hammond*, 996 F.3d 374, 385 (7th Cir. 2021). Prior to *Carpenter*, the Stored Communications Act allowed law enforcement to obtain historical cell phone location records via a court order. 138 S. Ct. at 2221 (citing 18 U.S.C. § 2703(d)). To obtain an order under the Act, the government was required to show "'reasonable grounds for believing that the records were 'relevant and material to an ongoing investigation,'" and this threshold fell "well short of the probable cause required for a warrant." *Id*.; *United States v. Curtis*, 901 F.3d 846, 848 (7th Cir. 2018).

In the instant case, the prosecution sought a court order for Petitioner's historical cell phone location information from his telephone provider under the then controlling Stored Communications Act standard. (Dkt. 13-6, pg. 90-92.; Dkt. 13-10, pg. 53). During the hearing on the motion, defense counsel stated that he was not waiving any Fourth Amendment argument,

6

but he made no Fourth Amendment argument in opposition to the motion. (Dkt. 13-10, pg. 57.) The trial court granted the motion. *Id*. at 60.

On direct appeal, in light of *Carpenter*, Petitioner raised a single issue of ineffective assistance of counsel for failing to bring a motion to suppress his historical cell phone location information under the Fourth Amendment. (Dkt. 13-2.) The state appellate court rejected the claim in accordance with *Strickland v. Washington*, 466 U.S. 668 (1984). *Minkens*, 2020 IL App (1st) 172808, at ¶¶ 18-26. Regarding defense counsel's performance, the state court recognized that *Carpenter* was decided multiple years after the trial court granted the prosecution's motion and Petitioner's conviction at trial. *Id*. at ¶ 20. Additionally, the court concluded Petitioner could not demonstrate prejudice due to the strength of the other evidence presented at trial. *Id*. at ¶ 23. Petitioner raised the *Strickland* issue in his petition for leave (PLA) to appeal, (Dkt. 13-5.) and the PLA was denied by the Supreme Court of Illinois completing his direct appeal. *Illinois v. Minkens*, No. 126563, 163 N.E.3d 706 (Ill. Jan. 27, 2021) (Table).

**II.     Analysis**

Petitioner now brings the instant habeas corpus petition renewing the ineffective assistance of trial counsel claim for failing to move to suppress the historical cell phone location data and associated FBI agent testimony.[1] The claim is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). The Court's review is of the state appellate court opinion because that is the last reasoned decision from a state court resolving the claim on the merits. *Harris v.*

---

1 The Court noted in its prior order screening the habeas corpus petition that Petitioner had a then pending postconviction appeal. (Dkt. 6, pg. 1.) The habeas corpus petition, however, brought only the single ineffective assistance of trial counsel claim, which was exhausted on direct appeal, and so there was no reason to delay adjudication of this case. Moreover, the Court gave Petitioner the opportunity to amend his petition to include claims raised in the postconviction petition, (Dkt. 6, pg. 2.) but he declined to do so.

7

*Thompson*, 698 F.3d 609, 623 (7th Cir. 2012) (citing *Green v. Fisher*, 565 U.S. 34, 40 (2011); *Garth v. Davis*, 470 F.3d 702, 710 (7th Cir. 2006)).

Under the AEDPA, the Court may not grant habeas relief unless the state court's decision on the merits was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or the state court decision is based on an unreasonable determination of facts. 28 U.S.C. § 2254(d). "The AEDPA's standard is intentionally 'difficult for Petitioner to meet.'" *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (per curiam) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014); *Metrish v. Lancaster*, 569 U.S. 351, 358 (2013)). This "'highly deferential standard [] demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

An ineffective assistance of counsel argument is governed by *Strickland v. Washington*, 466 U.S. 668 (1984). To demonstrate ineffective assistance of counsel, Petitioner must show both deficient performance and prejudice. *Premo v. Moore*, 562 U.S. 115, 121 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)). The Court's review under *Strickland* is deferential, and applying *Strickland* under the AEDPA (which itself also requires deference) results in a double level of deference to the state court determination. *Knowles*, 556 U.S. at 123.

Petitioner cannot demonstrate the state appellate court's rejection of his claim was contrary to, or an unreasonable application of, *Strickland*. The state court correctly identified and applied the controlling *Strickland* standard. *Minkens*, 2020 IL App (1st) 172808, at ¶¶ 18-26.

Regarding counsel's performance, an attorney is not required to anticipate every change in the law, *Kirklin v. United States*, 883 F.3d 993, 997 (7th Cir. 2018), but she can be required to

8

make, or at least evaluate whether to make, an argument that is sufficiently foreshadowed by precedent existing at that time. *Bridges v. United States*, 991 F.3d 793, 804 (7th Cir. 2021). Such an approach comports with *Strickland's* requirement that counsel's performance is evaluated based on the circumstances as she faced them at that time without the "distorting effects of hindsight." 466 U.S. at 687.

The controlling law at the time of the pretrial motion hearing did not suggest a valid Fourth Amendment challenge to the prosecution's request to obtain Petitioner's historical cell site location information. Prior to *Carpenter*, there was no binding Illinois authority (either cases or statutory provision) resolving the issue. *Illinois v. Strickland*, 2019 IL App (1st) 161098, at *65. The Seventh Circuit had declined to resolve the issue, s*ee United States v. Daniels*, 803 F.3d 335, 351 (7th Cir. 2015), and federal courts of appeal that had spoken on the issue universally rejected the Fourth Amendment claim. *See United States v. Thousand*, 558 F. App'x 666, 670 (7th Cir. Mar. 12, 2014) (non precedential opinion) (discussing cases). The Seventh Circuit noted at that time that it "had not found any federal appellate decision accepting [the argument] that obtaining cell-site date from telecommunications companies --- under any factual scenario --- raises a concern under the Fourth Amendment." *Id*. Petitioner's counsel cannot be faulted for failing to raise a Fourth Amendment challenge as *Carpenter* was not decided until Petitioner's trial was complete, and *Carpenter* was not sufficiently foreshadowed by then existing precedent. *See United States v. Narvaez*, No. 18 CV 3629, 2020 WL 3275734, at *5 (N.D. Ill. Apr. 13, 2020) (rejecting ineffective assistance of counsel argument for trial counsel's failure to raise Fourth Amendment challenge to the government acquisition of historical cell site location information without a warrant because *Carpenter* was decided more than two years after defendant's trial and counsel

9

did not have an obligation to anticipate *Carpenter*). Petitioner thus cannot establish deficient performance with his attorney's failure to foresee and raise a *Carpenter* challenge.

Petitioner also cannot demonstrate prejudice. Petitioner must show both the Fourth Amendment claim is meritorious and there is a reasonable probability that the verdict would have been different absent the excludable evidence. *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986); *Ebert v. Gaetz*, 610 F.3d 404, 411 (7th Cir. 2010). Suppressing the historical cell site location information and the FBI agent's accompanying testimony would have had no impact on the guilty verdict in this case because the evidence of Petitioner's guilt was overwhelming.

The victim's mother testified that the victim and Petitioner went to the Applebee's restaurant at approximately 10:30 p.m. the night before her body was discovered in the forest preserves. *Minkens*, 2020 IL App (1st) 172808, ¶ 7. Two Applebee's employees confirmed that Petitioner and the victim were at the restaurant. *Id*. at ¶ 11.

Three hours later, at approximately 1:30 a.m., a surveillance video recorded Petitioner and the codefendant returning to her apartment and then going to a nearby gas station where Petitioner cleaned his car for approximately 30 minutes. (Dkt. 13-10, pgs. 1465-69, 1482.) The jury could reasonably conclude that Petitioner was cleaning his car in the middle of the night to eliminate evidence following the murder. The forensic investigation also found the victim's blood in Petitioner's car on the rocker panel. *Id*. at 1558-59. Petitioner also confessed to his jail cellmate, *id*. at 1337-51, attempted to have a friend, Josh Miller, lie about joining him and the victim at the Applebee's, *Minkens*, 2020 IL App (1st) 172808, ¶ 12, and lied to the police about being at a night club when the surveillance video showed he was 30 miles away at the gas station. *Id*. at ¶ 11. The evidence of Petitioner's guilt, independent of the historical cell location information, is

10

overwhelming, and he cannot establish the prejudice prong of his ineffective assistance of counsel claim.

In sum, Petitioner's claim is meritless, and consequently, the state appellate court's rejection of the claim is neither contrary to, nor an unreasonable application of, *Strickland*. The habeas corpus petition is denied on the merits.

**III.     Certificate of Appealability and Notice of Appeal Rights**

The Court declines to issue a certificate of appealability. Petitioner cannot make a substantial showing of the denial of a constitutional right, and reasonable jurists would not debate, much less disagree, with this Court's resolution of Petitioner's claims. *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

Petitioner is advised that this is a final decision ending his case in this Court. If Petitioner wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). Petitioner need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if Petitioner wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1).

The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

**IV. Conclusion**

Petitioner's habeas corpus petition (Dkt. 5.) is denied on the merits. Any other pending motions are denied as moot. The Court declines to issue a certificate of appealability. The Clerk is instructed to: (1) terminate Respondent Jackson, (2) add John Burle, Warden, Pontiac Correctional Center as Respondent; (3) alter the case caption to *Minkens v. Burle*; and (4) enter a Rule 58 judgment in favor of Respondent and against Petitioner. Civil Case Terminated.

ENTERED:

Dated: March 21, 2022

ROBERT W. GETTLEMAN
United States District Judge